IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CAHABA FORESTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:11-cv-423-WHA |
| | ) | (WO) |
| MARY GEORGE EAST HAY, DORIS | ) | |
| EAST RAGSDALE, LYNDA MARIE | ) | |
| EAST RICE WOODALL, JIMMY RAY | ) | |
| EAST, JENNINGS FELIX EAST, JR., | ) | |
| DONALD L. RUSH a/k/a Donald Lee Rush, | ) | |
| NANCY R. SCOTT, a/k/a Nancy D. Rush | ) | |
| a/k/a Nancy Rush Scott, MICHAEL D. | ) | |
| TWILLEY, JANICE TWILLEY BRYAN, | ) | |
| W. DAVID TWILLEY, CAROL ANN | ) | |
| TWILLEY DEWBERRY, JAMES FLOYD | ) | |
| CALDWELL, JOSEPHONE V. CALDWELL | ) | |
| a/k/a Josephine Caldwell Davis, WILLIE E. | ) | |
| CALDWELL, BETTY ANN HANSEN a/k/a | ) | |
| Betty A. Drivere, PAMELA TWILLEY | ) | |
| WELLBORN, and AMELIA D. TWILLEY | ) | |
| a/k/a Amelia Dawn Twilley a/k/a Amelia | ) | |
| Voltz a/k/a Amelia Twilley Paschal, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

This case is before the court on cross Motions for Summary Judgment filed by Plaintiff,

Cahaba Forests, LLC ("Cahaba") (Doc. # 26), and by the Defendants, Doris East Ragsdale,

Lynda Marie East Rice Woodall, Jimmy Ray East, Jennings Felix East, Jr., Donald L. Rush,

Michael D. Twilley, Janice Twilley Bryan, W. David Twilley, Carol Ann Twilley Dewberry,

James Floyd Caldwell, Josephine V. Caldwell, Willie E. Caldwell, Betty Ann Hanson, Pamela

Twilley Wellborn, and Amelia D. Twilley (collectively "the Twilleys")[1] (Doc. # 30).

Cahaba filed a Complaint for Declaratory Judgment in this case on June 2, 2011, (Doc. #

1), asserting jurisdiction based on diversity of citizenship, federal question, and supplemental

jurisdiction.  The Twilleys filed an Answer, Counterclaim and Third-Party Complaint (Doc. #

21).  Pursuant to this court's October 5, 2011, Order (Doc. # 39), the cross Motions for Summary

Judgment will be considered only to the extent that those motions address the issue of whether

Bowater's rejection in bankruptcy of the sublease and master lease with the Twilleys operated to

terminate Cahaba's possessory rights in the property, and whether Cahaba has standing to bring

its suit.  All other issues will not be addressed at this time.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . .

the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes

demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  Once the moving party

has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a

genuine issue for trial. *Id.* at 324.

---

[1] Mary George East Hay and Nancy R. Scott, despite being named as Defendants by
Cahaba, did not join in this motion or in the pleadings, and for simplicity, they are not included
in this term for purposes of this order.

2

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

### III. <u>FACTS</u>

There are no material differences in the parties' versions of the facts as they pertain to the issues now before the court. They are summarized as follows:

The Twilleys, a large number of family members who are all beneficiaries under a testamentary trust, own over 24,000 acres of undeveloped timberlands in counties within this district. On July 1, 1967, the land was leased by them to Kimberly-Clark Corporation ("K-C"),

with unrestricted possession and use, including full timber rights, for a term ending on June 29, 2032 (the "Master Lease").  The lease contained no prohibition or restriction as to subleasing, and required no consent of the Twilleys (the "Lessors").  Bowater Alabama LLC ("Bowater") subsequently became lessee under the Master Lease by virtue of becoming successor-in-interest to K-C.

On or about February 10, 2000, Bowater's predecessor-in-interest subleased all but 40 acres of the property to Cahaba, under an unrestricted sublease ("the Sublease") requiring Cahaba to comply with all terms of the Master Lease, to make payments called for directly to the Twilleys, and to pay ad valorem taxes on the land.  The Sublease was to terminate on the same day as the Master Lease, June 29, 2032.  The Twilleys were not parties to the Sublease.  So, at the times relevant to the issues under consideration, the Twilleys were lessors under the Master Lease, Bowater was lessee under the Master Lease and lessor under the Sublease, and Cahaba was lessee under the Sublease.

On or about March 21, 2006, Cahaba, Bowater, and all of the Twilleys jointly executed a "Termination and Cancellation of Lease Agreement" that withdrew approximately 153.5 acres from the lease and sublease upon payment of approximately $90,000 by the Twilleys to Cahaba.

On April 16, 2009, Bowater filed in the United States Bankruptcy Court for the District of Delaware a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code, as did its parent company, AbitibiBowater, Inc., and numerous other subsidiaries.  All of these petitions have been jointly administered in the Bankruptcy Court under Case No. 09-11296. At the time of the filing, all payments due to the Twilleys were current, having been paid by Cahaba directly to

the agent for the Twilleys under the terms of the Sublease.  These are annual payments due on July 1 of each year.  All taxes were current.

On August 3, 2009, the bankruptcy judge entered an order granting Bowater and all affiliated Debtors a ninety (90) day extension, through and including November 12, 2009, to assume or reject all unexpired non-residential leases of real property pursuant to § 365(d)(4) of the Bankruptcy Code (11 U.S.C. § 365(d)(4)).

Although the Sublease contained a provision that, in the event Sublessor became subject to a proposed plan of reorganization under Chapter 11, it would not seek rejection of the Master Lease, Bowater's Trustee allowed the deadline to pass without either assuming or rejecting the Master Lease or Sublease and, pursuant to § 365(d)(4), they were deemed rejected on November 12, 2009, under bankruptcy law.  There is no evidence before the court that the Master Lease and Sublease were listed by Bowater as either assets or debts,  or that either Cahaba or the Twilleys were listed as creditors or that either the Twilleys or Cahaba were given any notice of the deemed rejection at that time.

On or about June 15, 2010, Cahaba paid to the Twilleys, or their agent, the required rent for the year beginning July 1, 2010, and it was accepted.

On November 23, 2010, the Bankruptcy Court entered its findings of facts, conclusions of law, and order confirming Bowater's plan of reorganization and on December 9, 2010, the Court entered its Notice of (A) Occurrence of the Effective Date of the Plan and (B) Deadlines to File Administrative Claims, Fee Claims and Rejection of Damages Claims.  This Notice was addressed to all known creditors and equity interest holders.  There is no evidence before the

court that this notice was sent to either Cahaba or the Twilleys, or that either filed any type of claim in the Bankruptcy Court based on the deemed rejection.

On May 20, 2011, Hancock Forest Management, at the request and on behalf of Cahaba, sent letters to all of the Twilleys, with copy to their trustee, advising them of Bowater's Chapter 11 bankruptcy proceedings and of the deemed rejection of the Master Lease and Sublease and requesting them to execute an enclosed Estoppel and Agreement by June 20, 2011.  The proposed Estoppel and Agreement acknowledged that the deemed rejection in the bankruptcy court relieved Bowater from having to perform, but that it did not terminate the Master Lease or Sublease and had no effect on Cahaba's possessory or leasehold rights under the Sublease.  It then provided that the Twilleys recognized the Sublease and Cahaba's rights thereunder and deemed the Sublease converted to be a direct lease between them and Cahaba. The two Twilley family defendants who do not join in the motion of the Twilleys executed and returned the instrument, but the others refused.

On June 1, 2011, Cahaba tendered to the Twilleys' trustee the annual payment for the year to begin July 1, 2011.  On June 2, 2011, Cahaba filed this suit for declaratory judgment and its agent wrote letters to the Twilleys advising of the filing of suit.

Cahaba contends that its right to possess the timberlands under the Sublease continue to the end of the lease period, so long as it complies with its terms, despite the bankruptcy of Bowater.  The Twilleys contend that they have had the right of possession by virtue of § 365(d)(4) of the Bankruptcy Code since November 12, 2009, when the Master Lease and Sublease were deemed rejected by the Bankruptcy Court, and that Cahaba has had no rights under the Sublease since that time.

# IV.  DISCUSSION

The court will first address two jurisdictional issues raised by the Twilleys in their Motion for Partial Summary Judgment, then the preliminary issue of standing, and finally the question of the effect of Bowater's deemed rejection of the Sublease and Master Lease.

## A.  Jurisdiction

In their Answer, the Twilleys deny the jurisdictional averments of the Complaint.  In their brief, they suggest that this court lacks subject matter jurisdiction because "[i]n the event of disputes under the Plan, the bankruptcy court retains jurisdiction for the purposes of, among other things, . . . enforcing and interpreting the terms and conditions of the Plan Documents." *In re Celotex Corp.*, 487 F.3d 1320, 1326 (11th Cir. 2007).  Essentially the Twilleys argue that the interpretation of Cahaba's rights falls under the jurisdiction of the Bankruptcy Court in Delaware where Bowater's Chapter 11 proceedings were held and not this court's.  While there are numerous bankruptcy court cases dealing with issues involved in this case, and while the court will examine the effect of provisions of the Bankruptcy Code, as the court will discuss later, the court finds that the Master Lease and Sublease were not a part of the bankruptcy estate, the bankruptcy estate will not be affected, and the rights of the parties will be finally determined on the basis of state law.  As explained below, this court will look to state law not in contravention of the Bankruptcy Code but pursuant to it.

The court also finds that it has jurisdiction by virtue of diversity of citizenship (29 U.S.C. § 1332).

## B.  Standing

The Twilleys contend that Cahaba lacks standing to pursue its rights under the Sublease with Bowater because Cahaba is not in privity with the Twilleys as to the Master Lease. Essentially, the Twilleys' argument is that Cahaba as "[a] third person has no rights under a contract between others," and because Cahaba is not a party to the Master Lease, it has no standing to file this declaratory judgment action. Cahaba asserts that the problem with the Twilleys' argument is that it incorrectly characterizes Cahaba's claim as one to enforce the Master Lease instead of a claim about enforcing its right to the property pursuant to the Sublease with Bowater. Cahaba claims that the Sublease is still in effect, and if a judgment is not rendered by the court on this matter declaring its possessory interest thereunder as proper, it will suffer financial harm.

"It is by now axiomatic that 'Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies.'" *DiMaio v. Democratic Nat. Committee*, 520 F.3d 1299, 1301 (11th Cir. 2008) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471 (1982)) (some internal quotations omitted). The standing inquiry "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Even though Cahaba is seeking relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, it still must satisfy the case-or-controversy standard. *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).

In order to demonstrate this requisite standing requirement, Cahaba must demonstrate that there is a "substantial continuing controversy between parties having adverse legal interest." *Emory*, 756 F.2d at 1552 (citing *Lake Carriers' Association v. MacMullan*, 406 U.S. 498, 506

8

(1972)).  Moreover, Cahaba "must allege facts from which the continuation of the dispute may be reasonably inferred," and "the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury."  *Id*. (internal citations omitted).  Cahaba has alleged that the property is sizable, just over 24,000 acres, and that the continuation of its business necessarily depends on this court's interpretation of Bowater's bankruptcy's effect on Cahaba's possessory interest in the property.  Furthermore, Cahaba has alleged, and the Twilleys have demonstrated with their Answer and Counterclaim, that there are two adverse positions as to the validity of the Sublease and the right to possession of the property which are not hypothetical or conjectural.  Therefore, the court finds that an actual controversy exists in this case regardless of any lack of contractual privity between Cahaba and the Twilleys, because both parties have ongoing and continual adverse legal interests that can be reasonably inferred from the facts.  Accordingly, Cahaba has met the standing requirements for a 28 U.S.C. 2201 claim.  Having disposed of the Twilleys' jurisdictional and standing issues, the court turns to the effect of Bowater's rejection of the Sublease and Master Lease.

### C.  Bankruptcy Law

§ 365(a) of the Bankruptcy Code provides:

Except as provided in . . . subsection . . .(d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired leased of the debtor.

§ 365(d)(4) provides:

(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is lessee shall be deemed rejected, and the trustee

shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of –

> (i) the date that is 120 days after the date of the order of relief; or

> (ii) the date of entry of an order confirming a plan.

(B) The court may extend the period determined under subparagraph (A) . . . for 90 days on the motion of the trustee. . . .

Although there is no evidence before the court that this Master Lease and Sublease were specifically referred to in any motion by the trustee, and the Bankruptcy Court's single order of extension was issued in the jointly administered cases without reference to specific leases, the parties are in agreement that the order of extension had the effect of working a deemed rejection of the Master Lease and Sublease on November 12, 2009. The dispute is over the effect of that deemed rejection on the Sublease.

While there are numerous cases from around the country, as well as commentary, showing a split of authority as to whether such a deemed rejection constitutes a termination or a breach of an unexpired nonresidential real property lease, the parties here agree that it constitutes a breach, and not a termination. Therefore, there is no need to discuss the two sides of that controversy. The dispute here is about the effect that the breach resulting from the deemed rejection then had on the rights of the parties to the property. The Twilleys contend that the provision of § 365(d)(4) requiring the trustee to "immediately surrender" the property to the lessor is controlling and means that Cahaba thereafter had no right to any type of possession by virtue of bankruptcy law. Cahaba contends that state law determines the issue. The court looks again to § 365 of the Bankruptcy Court.

§ 365(h)(1)(A) provides:

If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and –

. . . .

> (ii) If the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) . . . to the extent that such rights are enforceable under applicable nonbankruptcy law.

This section applies here since Bowater, the debtor, was the lessor under the sublease.

Reading these sections together "produces the anomalous result of the [Debtor] being obligated to surrender the Premises, but [the sublessee] not having to. The matter is resolved by resort to forum law. Thus, the dual rejection which occurred here will leave [the landlord] and [the sublessee] to vie for possession of the Premises according to [state law]." *Chatlos Systems, Inc. v. Kaplan*, 147 B.R. 96, 99 (Bankr. D. Del 1992) (quoting from *Envireco International Motors, Inc. v. Elmhurst Transmission Corp. (In re Elmhurst Transmission Corp.)*, 60 B.R. 9, 10 (Bankr. E.D.N.Y. 1986). "Here, both the Lease and Sublease have been deemed rejected, leaving the bankruptcy estate with no meaningful interest in the ultimate disposition of the Premises." *Id*. at 100 (quoting from *In re Dial-A-Tire*, 78 B.R. 13, 16 (Bankr. W.D.N.Y. 1987).

The same approach was taken by the Bankruptcy Court of this district in the analogous case of *Miller v. Hill (In re Zip Enterprises, Inc.)*, 28 B.R. 223 (Bankr. M.D. Ala. 1983). There, the court dismissed for lack of jurisdiction a complaint for declaratory judgment filed by a party with a competing claim as an assignee or sublessee under the lease against a bankruptcy trustee, a lessor under a lease to the bankrupt debtor, and a company claiming rights as an assignee or sublessee. The lease had been deemed rejected in the bankruptcy proceedings. The court held

that by virtue of the deemed rejection, the lease ceased to be an asset of the bankruptcy estate and, since the controversy did not involve the estate or the trustee, or any property of the estate, it should be resolved in pending parallel state court proceedings. *Id.* at 225.

Likewise, after reaching the conclusion that a deemed rejection of a lease in bankruptcy proceedings constituted a prepetition breach, rather than termination, of the lease, the 5th Circuit Court of Appeals, in an analogous case involving the rights of the holder of a security assignment of a lease by a bankrupt lessee, held that the extent of those rights as against the debtor's lessor should be decided in state court. This was "because after rejection, the debtor's estate had no remaining interest in the outcome of that controversy, which is not 'related to' the bankruptcy as is required for federal jurisdiction." *Eastover Bank for Savings v. Sowashee Venture (In re Austin Development Co.)*, 19 F. 3d 1077, 1084 (5th Cir. 1994).

So, what we have here is a case where the debtor/lessee (Bowater) was required by bankruptcy law to immediately surrender possession of the subject property to its lessor (the Twilleys) upon its deemed rejection of a lease, which at that time was a breached lease, under which Cahaba was a sublessee, and with the rights of the sublessee as against the original lessors to be determined according to Alabama law. That determination may be made by this federal court by virtue of its diversity of citizenship jurisdiction. But, before turning to state law for that, the court must first look at the nature of the lease to which the property was subject after its surrender.

The case of *Thompkins v. Lil' Joe Records*, 476 F. 3d 1294 (11th Cir. 2007) is instructive. In the analogous context of an executory contract, it is clear that the Eleventh Circuit does not

view a deemed-rejection of an executory contract by a bankruptcy court "as an outright dissolution of the contract." *Id. at 1306.*

The *Thompkins* court, quoting *Cohen v. Drexel Burnham Lambert Group, Inc.* (*In re Drexel Burnham Lambert Group, Inc.*), 138 B.R. 687, 703 (Bankr. S.D.N.Y. 1992), explained that a "rejection 'does not embody the contract-vaporizing properties so commonly ascribed to it . . . . Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear.'" *Id.* at 1306. The Eleventh Circuit, and other sister circuits, have found that a rejection does not affect the contract's continuing existence and certainly does not serve as a cancellation, termination, vaporization, or repudiation of the contract. *Id.* at 1306-07; *see also Austin Dev. Co.*, 19 F.3d at 1082 ("[t]hree circuits, including this one, have held that [§ 365(g)] does not mean that the executory contract or lease has been terminated, but only that a breach has been deemed to occur."); *O'Neill v. Continental Airlines, Inc. (In re Cont'l Airlines)*, 981 F.2d 1450, 1459 (5th Cir. 1993) ("[t]o assert that a contract effectively does not exist as of the date of rejection is inconsistent with deeming the same contract breached."); *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. at 708 ("[r]ejection has absolutely no effect upon the contract's continued existence; the contract is not cancelled, repudiated, rescinded, or in any other fashion terminated.") (internal citations omitted); *cf. Enterprise Energy Corporation v. United States (In re Columbia Gas Sys., Inc.)*, 50 F.3d 233, 239 n. 8 (3d Cir. 1995) (citing § 365(g) for the proposition that a "[r]ejection, which is appropriate when a contract is a liability to the bankrupt, is equivalent to a nonbankruptcy breach.").

The court finds that this concept applies to a deemed-rejected unexpired lease as well. The land was surrendered to the Twilleys by Bowater subject to all of the terms of the now-

breached Master Lease, with Bowater no longer having any rights under it, but with Cahaba's

rights under the Sublease to be determined by Alabama law.

### D.  Lease Termination Under Alabama Law

The court must now determine the effect, under Alabama state law, of Bowater's breach

of the Master Lease and surrender of the property as to the validity of Cahaba's continuing

possession pursuant to the Sublease.

Under Alabama law, a sublessee's right to possession of property is subject to the terms

and conditions of the master lease.  *USA Petroleum Corp. v. Jopat Bldg. Corp.*, 343 So. 2d 501,

504 (Ala. 1977) ("As a sublessee, USA's right to possession was subject to the terms and

conditions of [lessee/sublessor's] lease.  The Sublessee could stand no higher than the Lessee

from which its right derived.").  Therefore, the validity of Cahaba's Sublease will turn directly on

the continuing validity of Bowater's breached-but-not-terminated Master Lease in light of

Bowater's breach and surrender under bankruptcy law.  Accordingly, this court will look to the

provisions of the Master Lease which give rise to termination and the enforceability of those

provisions under Alabama law.

Page eleven of the Master Lease provides the following:

If at any time during the term of this lease there shall be filed by or against K-C[2]
in any court . . . a petition for . . . reorganization under the bankruptcy laws of the
United States of America, . . . Owner shall have the option of immediately
cancelling and terminating this lease . . . .

---

[2] While the Master Lease states that the lessee is K-C, neither party contests that Bowater
is a proper successor-in-interest to K-C and is therefore bound by the same terms as K-C.

14

This type of clause is commonly referred to as a bankruptcy clause or an *ipso facto* clause. Given that Bowater, the current lessee under the Master Lease, has filed for Chapter 11 reorganization, the plain language of the lease makes it clear that the Twilleys as lessors of the property have the right to terminate the Master Lease. Cahaba, however, counters that bankruptcy clauses are unenforceable pursuant to Bankruptcy Code § 365(e)(1), and therefore, the bankruptcy provision in the Master Lease is void.[3]

Section 365(e) of the Bankruptcy Code provides that:

(1)Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

Cahaba argues that the bankruptcy provision from the Master Lease falls squarely under § 365(e)(1)(A) or § 365(e)(1)(B) and is therefore subject to the prohibitions of the Bankruptcy Code. This argument, however, misconstrues the effect of § 365(e), which is limited in its application to the proceedings in bankruptcy. The purpose of this provision in the Bankruptcy Code is to protect the bankrupt debtor and its creditors by allowing the debtor's trustee to accept an advantageous unexpired lease in spite of the bankruptcy, and to reject others. While the bankrupt lessee is protected by bankruptcy law from any liability to its lessor under an unexpired

---

[3] §365(e)(1) had not been enacted at the time the Master Lease was executed.

lease, there is no reason, or legislative intent, for this to adversely affect any other rights of the innocent lessor under state law.

The Appellate Court of Connecticut referred to legislative intent in the case of *Days Inn of America, Inc. v. 161 Hotel Group, Inc.,* 739 A.2d 280, 284-285 (Conn. App. Ct. 1999).  In addressing the rights of non-bankrupt parties to a franchise agreement which contained an *ipso facto* clause, where the franchisee was in bankruptcy, that court examined the legislative history of § 365(e) and wrote:

> The rationale of Congress at the time [of adoption of § 365(e)] was to aid the debtor's rehabilitation efforts, presumably by allowing the debtor to retain profitable contracts with other parties.  See H.R.Rep. No. 595, 95th Cong. 1st Sess., 348 (1977); S.Rep. No. 989, 95th Cong. 2d Sess., 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-6305.[FN10]
>
>> FN10.  The legislative history provides in relevant part: "Subsection (e) invalidates ipso facto or bankruptcy clauses.  These clauses, protected under present law, automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy.  This frequently hampers rehabilitation efforts....
>>
>> "The unenforceability of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to the executory contracts and unexpired leases....
>>
>> "This subsection does not limit the application of an ipso facto or bankruptcy clause to a new insolvency or receivership after the bankruptcy case is closed.  That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of [disposition] of the executory contract or unexpired lease." 1978 U.S.C.C.A.N. 6304-6305.

The Supreme Court of Alabama cited with approval *Days Inn's* explanation of "the interplay between § 365(e)(1) and 'ipso facto' clauses" in *Sumlin Construction Co., LLC v.*

16

*Taylor*, 850 So. 2d 303, 311 (Ala. 2002), and footnote 10 from *Days Inn* was quoted in *Sumlin* in referring to legislative intent. *Id*. at 314-15. Furthermore, the *Sumlin* Court stated, "[l]astly, we conclude that in any event, § 365(e) is intended to apply only during the pendency of a bankruptcy case, and is inapplicable once the 'automatic stay' against ipso facto termination has been lifted by the closing of the bankruptcy case," and agreed with the reasoning in *Thomas American Stone & Building, Inc. v. White*, 142 B.R. 449 (D. Utah 1992) which found in part that "[o]nce an asset is taken from the bankruptcy estate the prohibition against bankruptcy termination clauses is no longer operative." *Id*. at 314.

This court finds that the Master Lease, by virtue of its being deemed rejected, is no longer subject to the automatic stay, and therefore, no longer part of the bankruptcy estate. *See, e.g.*, *Salzer v. Jocquel Supply* (*In re Salzer*), 180 B.R. 523, 528 (Bankr. N.D. Ind. 1993) ("Thus, when the lease was deemed rejected, the automatic stay as to the leased premises was terminated as well."). Accordingly, this court is led to the conclusion that the effect of the Master Lease and Sublease being deemed rejected and the non-residential real property being surrendered to the Twilleys, is that the rights of the Lessors, the Twilleys, and the sublessee, Cahaba, are governed by the terms of the Master Lease and Sublease, free of any bankruptcy law prohibition against enforcement of a bankruptcy or "ipso facto" clause.

That being the case, the last issue before this court is the effect of the Master Lease's bankruptcy clause on Cahaba's Sublease. The *Jopat* case bears a striking resemblance to the present case and is determinative of Cahaba's rights as the sublessee. In *Jopat*, the lessee-sublessor filed for insolvency, allowing the lessor to either terminate the lease or retake possession of the premises without releasing the lessee's obligations by termination, pursuant to

a bankruptcy clause found in the original lease agreement.[4]  *Jopat*, 343 So. 2d at 502-03.  The Court found that under the bankruptcy clause the sublessee's right to possession was subject to the terms and conditions of the original lease.  *Id*. at 504 ("The Sublessee could stand no higher than the Lessee from which its right derived.").

The bankruptcy clause in the Master  Lease here gave the Twilleys the right to terminate the lease in the event of the lessee's filing for bankruptcy.   § 365(d)(4) of the Bankruptcy Code had the effect of staying that right for a period of time, to give Bowater's trustee the opportunity to assume the Master Lease and Sublease.  Once that time passed without assumption, they were deemed rejected, were no longer subject to being a part of the bankruptcy estate, and the Twilleys were then entitled to possession of the property, free of the bankruptcy proceedings and subject to all terms of the Master Lease, which had been assumed by Cahaba under the Sublease.  The Master Lease did not make the filing in bankruptcy by Bowater an automatic termination, but gave the Twilleys the option of terminating the master Lease or of continuing with it, with the Sublease still in effect.  Thus, under *Jopat*, the Twilleys were the free to terminate the Master Lease, and upon its termination Cahaba's rights under the Sublease would also terminate.  This result is not only by operation of law, but under the specific term of Cahaba's sublease by which Cahaba agreed that "[t]his Sublease shall terminate in the event the Main Lease terminates."

### V.  <u>CONCLUSION</u>

For the foregoing reasons, it is hereby ORDERED as follows:

1.  Cahaba has standing to bring this action, the court has jurisdiction by diversity of citizenship, and the Twilleys' motion is DENIED to that extent.

---

[4]  § 365(e)(1) had not been enacted at the time *Jopat* was decided.

2.  The effect of Bowater's deemed rejection of the Master Lease and Sublease pursuant to § 365 of the Bankruptcy Code was to give the Twilleys the right to terminate the Master Lease, and its termination would have the effect of terminating the Sublease.  Cahaba's motion is DENIED, and the Twilleys' motion is GRANTED to that extent.

3.  All other issues are reserved for future determination.

Done this 6th day of February, 2012.


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE