IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| CAHABA FORESTS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:11-cv-423-WHA |
| | ) | |
| MARY GEORGE EAST HAY, DORIS | ) | |
| EAST RAGSDALE, LYNDA MARIE EAST | ) | |
| RICE WOODALL, JIMMY RAY EAST, | ) | |
| JENNINGS FELIX EAST, JR., DONALD L. | ) | |
| RUSH (a/k/a DONALD LEE RUSH), NANCY | ) | |
| R. SCOTT (a/k/a NANCY D. RUSH, NANCY | ) | |
| RUSH SCOTT), MICHAEL D. TWILLEY, | ) | |
| JANICE TWILLEY BRYAN, W. DAVID | ) | |
| TWILLEY, CAROL ANN TWILLEY | ) | |
| DEWBERRY, JAMES FLOYD CALDWELL, | ) | |
| JOSEPHINE V. CALDWELL (a/k/a | ) | |
| JOSEPHINE CALDWELL DAVIS), WILLIE | ) | |
| E. CALDWELL, BETTY ANN HANSEN | ) | |
| (a/k/a BETTY A. DRIVERE), PAMELA | ) | |
| TWILLEY WELLBORN, and AMELIA D. | ) | |
| TWILLEY (a/k/a AMELIA DAWN | ) | |
| TWILLEY, AMELIA VOLTZ, AMELIA | ) | |
| TWILLEY PASCHAL), | ) | |
| | ) | |
| Defendants, | ) | |
| v. | ) | |
| | ) | |
| HANCOCK NATURAL RESOURCE | ) | |
| GROUP, INC., HANCOCK TIMBER | ) | |
| RESOURCE GROUP, INC., HANCOCK | ) | |
| FOREST MANAGEMENT, INC.,   and | ) | |
| JOHN HANCOCK TIMBER RESOURCE | ) | |
| CORPORATION, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

This case is before the court on two motions: a Second Motion for Summary Judgment filed by Plaintiff, Cahaba Forests, LLC ("Cahaba") and Third-Party Defendants, Hancock Natural Resource Group, Inc., Hancock Timber Resource Group, Inc., Hancock Forest Management, Inc., and John Hancock Timber Resource Corporation, (collectively "Hancock") (Doc. #120), and the Twilleys' Motion for Partial Summary Judgment filed by the Defendants, Doris East Ragsdale, Lynda Marie East Rice Woodall, Jimmy Ray East, Jennings Felix East, Jr., Donald L. Rush, Michael D. Twilley, Janice Twilley Bryan, W. David Twilley, Carol Ann Twilley Dewberry, James Floyd Caldwell, Josephine V. Caldwell, Willie E. Caldwell, Betty Ann Hanson, Pamela Twilley Wellborn, and Amelia D. Twilley (collectively "the Twilleys")[1] (Doc. #123).

Cahaba filed a Complaint for Declaratory Judgment in this case on June 2, 2011 (Doc. #1), asserting jurisdiction based on diversity of citizenship, federal question, and supplemental jurisdiction.  The Twilleys filed an Answer, Counterclaim and Third-Party Complaint (Doc. #21) and an Amended Counter-Claim and Third-Party Complaint (Doc. #50).  The parties filed their first round of cross Motions for Summary Judgment, which the court considered only to the

---

[1] Mary George East Hay ("Hay") and Nancy R. Scott a/k/a Nancy D. Rush ("Scott"), despite being named as Defendants by Cahaba and served, did not join in this motion or file any pleadings, and for simplicity, they are not included in this term for purposes of this order unless stated otherwise.  "The Twilleys" refers to all tenants in common of the involved real estate except those two.  "The Twilley family" will refer to all tenants in common, including those two.  Also, the court will not include the parenthetical a/k/a names shown for some parties in the caption.

extent that the motions addressed the issue of whether Bowater's rejection in bankruptcy of the Sublease and the Master Lease with the Twilleys operated to terminate Cahaba's possessory rights in the property, and whether Cahaba had standing to bring its suit (Doc. #39).  On February 6, 2012, the court issued a Memorandum Opinion and Order (Doc. #54) (2012 WL 380126), which stated the court's findings that Cahaba had standing to bring its suit and that Bowater's deemed rejection operated as a breach of the Master Lease, but did not automatically terminate it.  The court found that the bankruptcy clause in the Master Lease gave the Twilley family the right to terminate the lease in the event of Bowater's filing for bankruptcy; however, the court left open the questions of whether the Twilleys had expressly terminated the lease and whether any actions by the Twilleys operated as a termination or a waiver of the right to terminate (Doc. #69).  On November 5, 2012, the parties filed their second summary judgment motions addressing these issues, and on January 22, 2013, the court heard oral argument on the motions.  Cahaba and Hancock move for summary judgment on Cahaba's Complaint and on the Twilleys' Counter-Claims and Third-Party Claims.  The Twilleys move for summary judgment on Cahaba's Complaint.

For the reasons to be discussed, Cahaba's and Hancock's Second Motion for Summary Judgment (Doc. #120) is due to be GRANTED, and the Twilleys' Motion for Partial Summary Judgment (Doc. #123) is due to be DENIED.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## III.  <u>FACTS</u>

These facts are undisputed:

The Twilley family consists of 17 heirs and descendants of C.C. Twilley who now own as tenants in common over 24,000 acres of undeveloped timberlands in counties within this district, through five trusts established under the will of C. C. Twilley.  On July 1, 1967, the land was leased to Kimberly-Clark Corporation ("K-C"), by the executor and trustee under the will of C.C. Twilley, with unrestricted possession and use, including full timber rights, for a term ending on June 30, 2032 (the "Master Lease").  The lease contained no prohibition or restriction as to subleasing, and required no consent of the Lessor.  Bowater Alabama LLC ("Bowater") subsequently became lessee under the Master Lease by virtue of becoming successor-in-interest to K-C.

On or about February 10, 2000, Bowater's predecessor-in-interest, K-C, subleased all but 40 acres of the property to Cahaba, under an unrestricted sublease ("the Sublease") requiring Cahaba to comply with all terms of the Master Lease, to make payments called for directly to the Twilley family, and to pay *ad valorem* taxes on the land.  The Sublease was to terminate one day before the Master Lease, June 29, 2032.  The Twilley family members were not parties to the Sublease.  So, at the times relevant to the issues under consideration, the Twilleys, Hay and Scott were lessors under the Master Lease, Bowater was lessee under the Master Lease and lessor

under the Sublease of all but 40 acres of the property leased to it, and Cahaba was lessee under the Sublease.

On April 16, 2009, Bowater filed in the United States Bankruptcy Court for the District of Delaware a petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code, as did its parent company, AbitibiBowater, Inc., and numerous other subsidiaries.  All of these petitions have been jointly administered in the Bankruptcy Court under Case No. 09-11296.  At the time of the filing, all payments due to the Twilley family were current, having been paid by Cahaba directly to the agent for the Twilley family under the terms of the Sublease.  These are annual payments due on July 1 of each year.  All taxes were current.

The Master Lease contained a provision that "[i]f at any time during the term of this lease there shall be filed by . . . K-C[2] . . . a petition for dissolution or reorganization under the bankruptcy laws of the United States of America . . . Owner shall have the option of immediately cancelling and terminating this lease . . . ."  (Doc. #122-1).  The Sublease to Cahaba provided that "[t]his Sublease shall terminate in the event the Main Lease terminates."  (Doc. #122-3).

On August 3, 2009, the bankruptcy judge entered an order granting Bowater and all affiliated Debtors a ninety (90) day extension, through and including November 12, 2009, to assume or reject all unexpired non-residential leases of real property pursuant to § 365(d)(4) of the Bankruptcy Code (11 U.S.C. § 365(d)(4)).

Bowater's Trustee allowed the deadline to pass without either assuming or rejecting the Master Lease or Sublease and, pursuant to § 365(d)(4), they were deemed rejected on November 12, 2009, under bankruptcy law.  There is no evidence before the court that the Master Lease and

---

[2] Bowater's predecessor-in-interest.

Sublease were listed by Bowater as either assets or debts, or that either Cahaba or the Twilleys were listed as creditors in regard to the Master Lease or Sublease, and it appears to be agreed that they were not.[3]

Wells Fargo Bank, N.A. ("Wells Fargo") and its predecessors were the agent for accepting and distributing lease payments for all members of the Twilley family under agency agreements with them, and on or about June 15, 2010, Cahaba made to it the required lease payment for the year beginning July 1, 2010.  The money was distributed pro rata to the members of the Twilley family.

On November 23, 2010, the Bankruptcy Court entered its findings of facts, conclusions of law, and order confirming Bowater's plan of reorganization, and on December 9, 2010, the Court entered its Notice of (A) Occurrence of the Effective Date of the Plan and (B) Deadlines to File Administrative Claims, Fee Claims and Rejection of Damages Claims.  This Notice was addressed to all known creditors and equity interest holders.  It was not sent to the Twilleys, and neither the Twilleys nor Cahaba filed any type of claim in the Bankruptcy Court based on the deemed rejection of the Master Lease or Sublease.  Cahaba did have notice of the bankruptcy itself because of the listing of a separate executory fiber supply agreement between it and Bowater, and it had received notice of Bowater's rejection of that executory contract.  It did not file any rejection of damages claim based on Bowater's rejection of that executory contract.

On May 20, 2011, with the due date for an annual lease payment approaching, Hancock Forest Management, Inc., at the request and on behalf of Cahaba, sent letters to all of the Twilley

---

[3] Cahaba was listed as a creditor in regard to an entirely separate fiber supply agreement with Bowater.

family, with a copy to their agent, advising them of Bowater's Chapter 11 bankruptcy proceedings and of the deemed rejection of the Master Lease and Sublease and requesting them to execute an enclosed Estoppel and Agreement by June 20, 2011.  The proposed Estoppel and Agreement acknowledged that the deemed rejection in the bankruptcy court relieved Bowater from having to perform, but that it did not terminate the Master Lease or Sublease and had no effect on Cahaba's possessory or leasehold rights under the Sublease.  It then provided that the Twilleys recognized the Sublease and Cahaba's rights thereunder and deemed the Sublease converted to be a direct lease between them and Cahaba.  The cover letter for this proposed Estoppel and Agreement concluded by saying, "If you have any questions regarding this matter, please consult your attorney."   The two Twilley family defendants—Hay and Scott—who do not join in the motion of the Twilleys executed and returned the instrument, but the others refused.

On June 1, 2011, Cahaba tendered to the Twilley family's agent, Wells Fargo, the annual payment for the year to begin July 1, 2011.  On June 2, 2011, Cahaba filed this suit for declaratory judgment and Hancock Forest Management, Inc., which manages the forestry operation on the property, wrote letters to the Twilley family advising of the filing of suit.  Wells Fargo attempted to distribute their percentage interests in the June 1 payment to all members of the Twilley family.  Hay and Scott accepted their checks, but the other 15 would not.  On March 23, 2012, during the course of those proceedings, the Twilleys' attorney notified Cahaba's attorney that the Twilleys were terminating the Master Lease, if and to the extent that it had not already been terminated as a matter of law.  In June 2012, Hancock made the next lease payment to Wells Fargo, which Wells Fargo held.

Wells Fargo has been allowed to intervene in this action and has paid all money it is holding into court with its Amended Complaint in Interpleader, alleging that Hay and Scott want their pro rata share of the payment for the July 1, 2012 - June 30, 2013 year, but the other 15 do not, and asking for directions.

The court's prior Order of February 6, 2012 (Doc. #54) established that Bowater's deemed rejection in bankruptcy of the Master Lease and Sublease did not operate as a termination, but as a breach of the Master Lease, which allowed, but did not require, termination. The case is now before the court on whether any actions by the Twilleys either terminated the Master Lease and therefore the Sublease, or waived its termination.  The court will also consider the Twilleys' counterclaims and third-party claims against Cahaba and Hancock.

## IV.  DISCUSSION

The court will first address the status of the Master Lease and Sublease, and then will discuss the Twilleys' counterclaims and third-party claims.

### A.  The Master Lease and Sublease

In the court's prior order on summary judgment, it found that Bowater's deemed rejection of the Master Lease gave the Twilleys the right to terminate the Master Lease, which if exercised would terminate the Sublease.  The court reserved for future determination whether any actions by the Twilleys did terminate the Master Lease or whether any of their actions had the effect of waiving that termination right.  The parties have addressed this issue in their briefs supporting their motions for summary judgment.

9

Although the parties submitted lengthy briefing on whether the Master Lease is terminated, there is one deciding factor: only 15 of the 17 members of the Twilley family argue that the lease is terminated. In the duration of this case, two Twilley heirs -- Hay and Scott -- have never joined with the other defendants in alleging that any actions by Bowater in bankruptcy, or by either party after the deemed rejection, amounted to a termination of the Master Lease. In fact, Hay and Scott's inaction in this suit suggests that their desire is to continue the relationship with Cahaba under the Master Lease and Sublease. Hay and Scott were the only members of the Twilley family to execute the Estoppel and Agreement sent to them by Cahaba, which was meant to form a direct lease relationship with Cahaba and continue the status quo. After a thorough analysis of the applicable law, the court finds that Hay's and Scott's absence from the other Defendants' pleadings and motions, in addition to their prior actions, defeats the Twilleys' arguments for termination.

At oral argument, the Twilleys seemed to concede that the concurrence of all 17 members of the Twilley family was required to terminate the Master Lease, if it was not terminated by the deemed rejection in bankruptcy, but in subsequent briefing they contend that they could effectively terminate as to their separate 15/17 interests.

Before reaching the question of termination, the court will examine the property interests of the Twilleys as stated by the legal documents submitted with the parties' summary judgment motions. The Master Lease in this case was made and entered into by Birmingham Trust National Bank ("BTN Bank"), as executor and trustee under the will of C.C. Twilley, who before his death was the owner in fee simple absolute of the property at issue, and the Kimberly-Clark Corporation ("K-C"). In the language of the Master Lease, BTN Bank is referred to as the

"Owner" of the property.  The agreement leased the Twilley land and timber rights to K-C for 65 years in exchange for annual payments to the Owner, among other obligations.  In Section 19 of the Master Lease, it states that "[t]he term of this lease could extend beyond the period of existence of the Estate of C.C. Twilley, Deceased, and of the duration of the trust or trustee created under [his] Last Will and Testament . . . . Owner, in order to make workable and convenient the administration of the lease . . . appoint[s] [BTN Bank], and such successor corporation or assignee, . . . as its agent."  (Doc. #122-1).  Pursuant to the will of C.C. Twilley, five separate trusts were created for the benefit of his heirs.  These trusts were managed by BTN Bank, and later by its successor-in-interest, SouthTrust Bank ("SouthTrust"), until the trusts terminated under the terms of the will.  Upon termination of the trusts, a separate interest in the title of the property vested in each of the Twilley heirs.  ("Ground Lessor Estoppel and Agreement" Doc. #122-5).   All trusts had terminated by 2005 and SouthTrust and its successors, now Wells Fargo, continued to collect and distribute lease payments for the 17 members of the Twilley family under separate agreements with them.

The descent of real property from a land owner to his heirs creates a tenancy in common, unless otherwise provided by a will or trust.  *See Crawford v. Crawford*, 28 So. 2d 196, 197 (Ala. 1946) (heirs of intestate became tenants in common with undivided interests).  The will and trust of C.C. Twilley did not provide otherwise.

It is undisputed in this case that the Twilley family received their property interests as heirs under the trusts that were established pursuant to the terms of C.C. Twilley's will, so that they relate to each other as tenants in common.   Tenants in common hold separate and distinct title in their undivided interest in the property. *See Craig v. Javine*, 432 So. 2d 1304, 1306 (Ala.

Civ. App. 1983).  Although each individual member of the Twilley family may burden his or her property interest as he or she desires, they inherited those interests in the property subject to an existing lease.   It is generally held that when tenants in common have ownership interests subject to a lease of the common property, they may not terminate that lease without the consent of all tenants in common.  *See* 86 C.J.S. *Tenancy in Common* § 139 ("The consent or ratification of all tenants in common is required to modify, terminate, or forfeit a lease of the common property," and § 171 ("Tenants in common who have jointly leased common property to a third person must join as parties to cancel the lease . . . ."), and cases cited therein.

*Sun Oil Co. v. Oswell*, 62 So. 2d 783 (Ala. 1953), an equitable action concerning an oil, gas and mineral lease, provides an analogy to the instant case.  In *Oswell*, an oil, gas and mineral lease was executed to the Sun Oil Company by the owners of land, after which the owners deeded the land to the Oswells.  The Oswells received title as tenants in common, encumbered by the lease.  Before the suit arose, the Oswells conveyed an undivided half interest in the oil, gas and minerals in the land to Humble Oil and Refining Company, making it a tenant in common with the Oswells as to those, all subject to the lease with Sun.  The Oswells then owned all surface rights in the land and an undivided half interest in the oil, gas and minerals described in the lease to Sun, and Humble owned an undivided half interest in the oil, gas and minerals described in the lease.  Alleging that Sun had violated certain covenants in the lease, the Oswells sued both Sun and Humble, seeking to declare the entire lease forfeited, even though Humble Oil opposed the plaintiffs' suit.  In analyzing applicable law generally, the court noted that "it is easy to hold that the lease when made with complainants' grantor was indivisible as to the lessee's covenants . . . . and, that status was not changed because the title to the reversion was broken into

12

shares, if there was no agreement thereafter made between the shareholders and Sun, the lessee."[4]  *Id.* at 787.

In support of its recognition of the general law, the court in *Oswell* cited an Oklahoma case, *Howard v. Manning*, 192 P. 358, 361 (Okla. 1920), as follows:

> [A] lessor could not fractionalize or apportion the *lessee's covenant* by either conveying the lands to several parties as tenants in common or dying and leaving it to a number of heirs.  The death of the lessor did not apportion or divide the covenant.  The lessee's covenant was not altered, modified, or affected by the death of the lessor other than with respect to the payment of the rent.  After passing out of the hands of the lessor's administrator (if he had one) each heir had the right to receive his part of the rent, but that did not apportion the indivisible covenants in the lease.  Upon the death of the lessor the lessee's covenants in question run to the heirs jointly and indivisibly.

*Oswell*, 62 So. 2d at 786 [emphasis in *Oswell*].  And, to illustrate the unreasonableness and unworkability of allowing fewer than all to terminate only their interests under the lease, and analogizing it to this case, the Oklahoma court said:

> If the right to enforce a forfeiture accrues [the bankruptcy], and a part of the tenants in common [the Twilleys] are allowed to elect to enforce the forfeiture, then the lessee [here the sublessee, Cahaba] is placed in the inequitable position of being bound by the lease as to part of the tenants [Hay and Scott] and discharged by a part [the Twilleys], which means that the lessee is still liable as a lessee to some of the tenants in common, although he cannot enjoy any of the benefits of his lease without becoming a trespasser and liable for damages to the other owners of the land . . . . This would create a sort of tenancy which, we believe, it would be unreasonable to hold that the lessor and lessee intended or contemplated.

---

[4] While the court held that a subsequent amendment to the lease effected separately by the joint owners served to sever the indivisibility of the covenants, so that the separate rights of Oswell and Humble could thereafter be exercised by either without the consent of the other, that did not change its recognition of the general principle, and the exception from that in Oswell is not present here.  *See id.* at 787.

*Howard*, 192 P. at 362.

In the case of *Eurengy v. Equitable Realty Corp.*, 107 S.W.2d 68, 71 (Mo. 1937), the Supreme Court of Missouri, while distinguishing, agreed with the same proposition, that "a contract of lease is indivisible and that the same cannot be canceled or forfeited unless all of the co-owners join in such action, as otherwise the lessee would be bound by the lease as to part of the co-owners and discharged as to part of the co-owners." This language from *Eurengy* was quoted with approval by the Supreme Court of Appeals of West Virginia in the 1955 case of *Fredeking v. Grimmett*, 86 S.E.2d 554, 564 (W.Va. 1955), which also quoted the language to that effect from *Howard*. These cases all support the general principle recognized by the Supreme Court of Alabama in *Oswell*.

Under Alabama law, a single tenant in common may deal with his separate interest freely through a mortgage, lease, or conveyance without the consent of the rest of the cotenants, but a tenant in common may not mortgage, lease, or convey an interest in the property greater than his own. *Crommelin v. Fain*, 403 So. 2d 177, 180-81 (Ala. 1981). In addition, the actions of a few tenants in common should not be allowed to prejudice the interests of the other tenants in common. *See Cherry v. Mazzone*, 568 So. 2d 799, 802 (Ala. 1990) (tenants in common had right to partition of full interest in property notwithstanding any conveyances made by another cotenant). None of this is inconsistent with the general principle discussed above.

The Twilleys have cited *Spurlock v. Spurlock*, 364 So. 2d 1149 (Ala. 1978), for the proposition that a tenant in common may terminate a lease as to his own interest. *Spurlock* involved four leases made among tenants in common in which a cotenant-lessor sued for cancellation of all four leases due to breach. The court held that cancellation was not an

14

appropriate remedy, but if cancellation were appropriate, the cotenant-lessor would only be entitled to a cancellation of the lease to which he was a party. *See id.* at 1150. "Relief by cancellation in a suit by one tenant in common involving leases made by several cotenants will be limited to the plaintiff's interest alone." *Id. Spurlock* is distinguishable because it involved a lease executed by cotenants for each of their separate shares, and cancellation was effective only as to each share.

Although the Defendants have not cited an Alabama authority which could support distinguishing *Oswell* in this case, this court is aware of a case from another jurisdiction which states that "[o]ne tenant in common may terminate a lease as to [his] own interest without the concurrence of the other cotenants." *Ahrens v. Dye*, 302 N.W.2d 682, 684 (Neb. 1981). *Ahrens* concerned tenants in common who had leased their undivided interests in the property to a lessee, which is different from the present case, in which the Twilleys inherited the lease on their property. The dissent in *Ahrens* distinguished the two cases cited by the majority and disagreed with the majority's statement, arguing that the result would keep a "lessee bound to part of the heirs but denied all practical benefits under the lease" due to the termination of the other cotenants' interests in the lease. The dissent cited *Howard, Eurengy,* and *Fredeking*. *See id.* at 685 (Boslaugh, J.). This court agrees with the reasoning of the dissent in *Ahrens*, and finds it, and the cases cited, to be consistent with Alabama law, which acknowledges that, while a tenant in common may deal with his interest in joint property in any way he desires, including terminating his interest in a lease made separately by all cotenants, an inherited lease that binds an indivisible interest in the joint property held by tenants in common must be analyzed differently. *See Oswell*, 62 So. 2d at 786-87.

Here, C.C. Twilley's executor and trustee leased the property to Bowater's predecessor in interest, and, before termination of all the trusts, Bowater subleased it to Cahaba, as allowed by the lease, and bound Cahaba to all terms of the lease.  It would be no more allowable under the law for 15 of the 17 members of the Twilley family to be able to terminate the Master Lease and Sublease over the objections of  2, than for the 2 to do so over the objections of the 15.  Further, to hold that the 15 could terminate only their interests, would create the situation condemned in *Howard* and the other cases cited above.  Cahaba would be bound to perform its forestry operations on the property for the benefit of the 2, but by doing so would become a trespasser as to the 15.  This makes no practical sense, and would not be consistent with Alabama law.

To summarize the findings of this court in its previous order and here: The deemed rejection of the Master Lease and Sublease by Bowater in its bankruptcy proceedings did not operate to automatically terminate the Master Lease and Sublease, but was a breach of the Master Lease.  The deemed rejection entitled the Twilley family to immediate possession of the property, free of the bankruptcy proceedings but subject to the breached Master Lease and Sublease.  Under the terms of the Master Lease, Bowater's filing in bankruptcy gave the Twilley family the option of immediately terminating the Master Lease, which would terminate all rights of Cahaba under provisions of the Sublease, or continuing with it.  Cahaba continued to be bound to perform under the Sublease, unless the Master Lease was terminated.  Termination of the lease cannot be accomplished by fewer than all 17 members of the Twilley family and, since 2 of the members do not agree to terminate, but wish to continue with it, the Master Lease and, in turn, the Sublease, have not been terminated.  Furthermore, the 15 Twilleys cannot terminate

15/17 of the lease, thereby fractionalizing Cahaba's covenants to which it is bound under the terms of the Sublease, and which 2/17 interests wish to enforce.

In view of the above, the court finds that the Master Lease and Sublease have not been terminated and continue in full force and effect, and Cahaba is entitled to summary judgment to that extent. The other contentions of Cahaba, including that termination was waived by not giving notice "immediately," that no notice of termination was given in the manner required by the Master Lease, and that actions of the Twilleys constituted a waiver of any right to terminate, or ratified the Sublease, are moot. If all 17 members of the Twilley family should attempt to terminate in the future, those may become issues in another action, based on facts that may exist at that time, but they are moot in this action.

### B.  The Twilleys' Counter-Claims and Third-Party Claims

The court will next address the Twilleys' claims against Cahaba and Hancock. On November 14, 2011, the Twilleys filed their First Amended Counter-Claim and Third Party Complaint (Doc. #50) which alleged the following: Count 1 – Recovery of Statutory Damages pursuant to Ala. Code §§ 9-13-62 and 35-14-1; Count 2 – Trespass; Count 3 – Conversion; Count 4 – Slander of Title; Count 5 – Negligence, Wilfulness and Wantonness; Count 6 – Fraud; Count 7 – Unjust Enrichment; Count 8 – Abuse of Process; Count 9– Accounting and Constructive Trust; Count 10 – Civil Conspiracy. Consideration proceeds in the context of the court having determined that the Master Lease and Sublease have not been terminated and continue to be in full force and effect.

### 1.  Claims Brought by Tenants in Common

As a preliminary matter, the court must decide whether these claims can be maintained by only 15 of the 17 Twilley owners of the property at issue in the Master Lease and Sublease. During oral argument on the parties' respective motions for summary judgment, the court *sua sponte* raised the issue of whether the Twilleys' tort claims must have been brought by all 17 Twilley family members, including the two Twilleys (Hay and Scott) who have not joined in any of these claims. The court directed the parties to brief this issue for its consideration.[5]

After reviewing the parties' briefs and the applicable law, the court finds that there must be unanimity of tenants in common to assert claims for injury to the possession of real estate. *See Ruffin v. Crowell*, 46 So. 2d 218, 221 (Ala. 1950) (action for injuries to the possession of property must be joined by all tenants in common); *Cochran v. Brannan*, 196 F. 219, 222 (S.D. Ala. 1912) (action for trespass to realty held in common must be joined by all tenants). However, when a claim alleges injury to the property itself, that action may be severed. Fewer than all the tenants in common may sue for injury to property, "provided that their recovery is limited to a proportionate share of the total damage." *Abrams v. Ciba Specialty Chems. Corp.*, 663 F. Supp. 2d 1259, 1270 (S.D. Ala. 2009); *see Abbot v. Braswell*, 265 So. 2d 871, 876–77 (Ala. 1972) (nuisance action properly brought by individual tenant in common). Therefore, whether or not the Twilleys' claims may proceed for further consideration depends on whether they are claims for injury to their possession of property, or injury to the property itself.

----

[5] The Twilleys filed an Objection and Motion to Strike (Doc. #215) in response to Cahaba and Third-Party Defendants' Supplemental Brief Concerning the Failure of the Twilleys' Claims (Doc. #213). The court will only consider the portions that are relevant to whether the Twilleys' tort claims may proceed without all 17 tenants in common, and it is ORDERED that the Objection and Motion are OVERRULED and DENIED as moot.

In the Twilleys' First Amended Counter-Claim and Third-Party Complaint (Doc. #50), they base their claims for trespass, conversion, slander of title, and negligence, wilfulness and wantonness at least in part on Cahaba's alleged injury to the Twilleys' possession of their property. In Count 2, the Twilleys allege that Cahaba's and Hancock's trespass interfered with the Twilleys' property rights and their exclusive possession, and caused damage to the condition and value of their property. The Twilleys' claim for negligence, wilfulness, and wantonness (Count 5) uses similar language. The Twilleys' claims for conversion (Count 3) and slander of title (Count 4) allege injuries and damage to the Twilleys' possessory interest in the leased property. To the extent that these claims allege injury to possession of common property, they must be joined by all tenants in common, and thus cannot proceed in this case. To the extent that these claims allege injury to property, they may be brought by 15 of the 17 tenants in common of the property. Therefore, because 2 of the Twilley family do not join in the claims, Cahaba and Hancock are due summary judgment on the claims of conversion and slander of title, and Cahaba is due summary judgment at this stage of consideration on the claims of trespass and negligence, wilfulness and wantonness to the extent that those claims allege injury to possession. The Twilleys' claims for injury to property due to Cahaba's and Hancock's alleged trespass and negligence, wilfulness and wantonness may proceed further, and the court will address them along with the merits of the other remaining claims.

<u>2. The Twilleys' Remaining Claims for Injury to Property</u>

The Twilleys' remaining claims are for statutory damages, trespass (for injury to property), negligence, wilfulness, and wantonness (for injury to property), fraud, unjust enrichment, abuse of process, accounting and constructive trust, and civil conspiracy.[6]

### a. Statutory Damages

The claim for statutory damages is based on Ala. Code § 9-13-62, which provides that "[a]ny person or entity who damages, destroys, cuts, or removes timber . . . not owned by that person or without the authority of the legal owner" must pay the owner double the fair market value of all timber that was damaged.  In addition, Ala. Code § 35-14-1 provides a landowner with a remedy for timber cut down without his or her consent.  As discussed previously, both the Master Lease and Sublease are currently valid and not terminated, and they provide consent from the Twilleys to Cahaba to cut down timber on the property within the parameters of the leases. Therefore, Cahaba and Hancock are due summary judgment on this claim.

### b. Trespass

The Twilleys' trespass claim alleges that the actions of Cahaba and Hancock caused damage to the condition and value of the Twilleys' land.  An essential element of trespass to land is intrusion without the consent of the landowner.  *See Harding v. Bethesda Reg'l Cancer Treatment Ctr.*, 551 So. 2d 299, 301 (Ala. 1989).  Lack of consent arises when there is entry to property "under a license for some particular purpose and [the licensee] went beyond that

_____

[6] The court has not considered the Declarations of Alan P. Bruce, Thomas Sarno, and Prab Dahal, or argument regarding them, and it is ORDERED that the Twilleys Motion to Strike in that regard (Doc. #187) is DENIED as moot.  The court also has not considered any documents ruled to be privileged, and it is ORDERED that Cahaba's and Hancock's Motion to Strike (Doc. #174) is DENIED as moot.  The court notes that consideration of the documents would not have resulted in a different result in ruling on these claims.

purpose." *Martin v. Fidelity & Cas. of N.Y.*, 421 So. 2d 109, 111 (Ala. 1982). Cahaba argues in its motion for summary judgment that a trespass claim will not stand if a lessee operated under the terms of the lease. *See Gulf Oil Corp. v. Deese*, 153 So. 2d 614, 619 (Ala. 1963). The Twilleys do not address the trespass claim in their response to Cahaba's motion. When a party does not argue a claim in response to the opposing party's motion for summary judgment, the court may treat the claim as abandoned. *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that district court was correct in ruling that plaintiff had abandoned its claim when it did not raise the issue after its complaint). Even if the court treated this claim as not waived, the Twilleys' trespass claim could not stand. The claim is predicated upon allegations that Cahaba and Hancock invaded the Twilleys' exclusive possession of the property. Because the Master Lease and Sublease, which allow Cahaba to possess the property and conduct timber operations thereon, have not been terminated, the Twilleys' claim for trespass fails.

c. <u>Negligence, Wilfulness and Wantonness</u>

The Twilleys' claim for negligence, wilfulness, and wantonness regarding injury to the property alleges that Cahaba and Hancock were negligent, wilful and wanton through their removal of timber and forest products, their transfer of hunting rights to third parties, and their concealment of Bowater's rejection of the Master Lease, all with no legal right to do so. Cahaba and Hancock argue that, like the Twilleys' trespass claim, the claims for negligent, wilful and wanton removal of timber and transfer of hunting rights cannot stand while the Master Lease and Sublease are valid. In their response to the motion, the Twilleys do not respond regarding the claim for negligence and only address the claims for wilfulness and wantonness as they relate to

21

the other claims for punitive damages.  The negligence claim has been abandoned.  *See Road Sprinkler*, 10 F.3d at 1568.  However, even if the Twilleys' negligence claim was not abandoned, it would fail on other grounds, as do the wilful and wanton claims.  The court finds that Cahaba had no duty not to transfer hunting rights or remove timber because under the terms of the Master Lease and Sublease, still in full force and effect, Cahaba was authorized to use the property for the removal of timber without restriction, subject only to the condition that the property satisfy certain specifications upon expiration of the lease in 2032, and Cahaba had exclusive hunting rights.  In addition, as discussed in detail below, Cahaba had no duty to disclose Bowater's rejection of the Master Lease to the Twilleys, which the Twilleys argue would have allowed them to immediately take possession of the property.  *See Lott v. Douglas Oil Purchasing Co.*, 501 So. 2d 1195, 1200–01 (Ala. 1986) (finding that lessee had no duty to disclose to lessor its failure to follow the terms of the lease and that lessee could "remain in possession, pay rent, and wait to see" if lessor would accept it).  No such duty was imposed under either of the leases, and there were no special circumstances or any confidential relationship in this case to warrant a duty to be imposed.  Without evidence to show duty, the Twilleys' negligence, wilfulness, and wantonness claims do not survive summary judgment.

d.  Fraudulent Misrepresentation and Suppression

The elements of a fraudulent misrepresentation claim are (1) false representation (2) of a material fact, (3) which was reasonably relied on, and (4) reliance on the misrepresentation caused injury.  *See AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008).  The Twilleys allege that Cahaba falsely represented that it was in a direct lease relationship with the Twilleys, and that Cahaba misrepresented the state of the lease after Bowater's rejection in

22

bankruptcy. To support these claims the Twilleys point to annual form rent letters sent from Cahaba's agent to the Twilley family's agent which read, in part, "[e]nclosed is a check for the rental due under terms of the lease agreement between [Cahaba] and [the Twilleys]." ("2009 letter" Doc. #126-6). In addition, Hancock's cover letter to the Estoppel and Agreement proposed by Cahaba states that Bowater's rejection of the Master Lease did not "adversely affect Cahaba's rights under the Sublease," but "[made] it prudent for the parties to clarify and reaffirm the respective rights and obligations of [the Twilleys] and Cahaba." The latter also advised, "If you have any questions regarding this matter, please consult your attorney. Also, please feel free to call me at any time." ("Proposed Estoppel and Agreement" Doc. #122-18).

The Twilleys argue that when Cahaba and Hancock made these affirmative representations, it had a duty to make them without fraud. "Even though one is under no obligation to speak as to a matter, if he undertakes to do so . . . he is bound not only to state truly what he tells, but also not to suppress or conceal any [material] facts within his knowledge . . . ." *Jackson Co. v. Faulkner*, 315 So. 2d 591, 600 (Ala. Civ. App. 1975) (internal citations omitted). However, as Cahaba and Hancock argue, this rule does the Twilleys no good with regard to the statements in the Estoppel and Agreement cover letter. Cahaba represented, through Hancock, that its rights under the Sublease were not affected by Bowater's rejection, and that has been Cahaba's contention all along. This representation is neither false nor misleading—as the court has held, Cahaba's rights were intact at the time the letter was sent, and although the Master Lease has a provision allowing for termination in the event of the lessee's bankruptcy, the Twilleys have always had the option to terminate the lease if they choose. As the court has previously held, Bowater's rejection made it possible for all 17 of the Twilley family to

23

terminate the Master Lease and as a result the Sublease; however, until that might be done, nothing about the rejection itself adversely affected Cahaba's rights.

The Twilleys also argue that Hancock's statement that there was a "lease agreement" between the parties in its annual rent payments was a fraudulent misrepresentation because many of the Twilleys were caused to believe Cahaba to be the direct lessee. However, the Twilleys were in possession of a multitude of legal documents identifying Cahaba as the sublessee to K-C, then to U.S. Alliance, and then to Bowater as successors-in-interest. In at least three agreements, either the Twilleys or the bank acting as executor and trustee acknowledged Cahaba's position as sublessee: a March 2006 Termination and Cancellation of Lease Agreement (Doc. #122-7) allowing some of the subleased property to be withdrawn for the benefit of the Twilley family, a Roadway Right-of-Way and Utility Agreement (Doc. #122-6), and an October 2000 Ground Lessor Estoppel and Agreement (Doc. #122-5). These documents gave the Twilleys notice of the parties' respective positions in the leases.

Even if Cahaba and Hancock had made fraudulent misrepresentations concerning the effect of Bowater's rejection of the leases and Cahaba's relationship to the Twilleys, the Twilleys' claims could not go forward because the evidence is insufficient to show that the Twilleys relied on these statements, or that their reliance was reasonable. They were not induced to sign the Estoppel and Agreement, but declined to do so. Only two of the Twilley family, Hay and Scott, signed the Estoppel and Agreement, their action did not bind the other 15, and those two do not join in the Twilleys' counterclaims and third-party claims. The Twilleys have argued since the inception of this lawsuit that Bowater's deemed rejection effected termination of the Master Lease—in no way did the Twilleys rely upon the Estoppel and Agreement letter's

24

contention that Cahaba's rights were secure.  There is also no evidence that the Twilleys relied upon Cahaba's alleged misrepresentation that it was the primary lessee under the Master Lease. The rent letters stating that there was a "lease agreement" between the parties were sent to the bank that handled the rent payments from Cahaba, not to the Twilleys.  Even if the Twilleys had seen and relied on those letters, rather than consulting the legal documents referred to above that outlined Cahaba's relationship to them, that reliance was not reasonable.  "[P]laintiffs alleging fraud cannot be said to have *reasonably* relied on alleged misrepresentations when they have been presented with information that would either *alert* them to any alleged fraud or would *provoke inquiry* that would uncover such alleged fraud."  *Sandoz, Inc. v. State*, 100 So. 3d 514, 527 (Ala. 2012) (emphasis in original); *see Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co.*, 390 So. 2d 601, 610 (Ala. 1980) ("If the plaintiff . . . was already in possession of knowledge and facts which the defendant fraudulently attempted to conceal, he can not complain that he has been misled . . . .").  Furthermore, it is not shown that identifying Cahaba as lessee, rather than sublessee, caused actionable injury.

The Twilleys also allege that Cahaba had knowledge of, but fraudulently suppressed, the fact of Bowater's deemed rejection of the Master Lease—that Cahaba was required, but did not, notify the Twilleys of the deemed rejection.  They allege that Cahaba actively concealed this information so that Cahaba could continue to possess the property and profit from the terms of the Sublease.  In order to maintain a claim for fraudulent suppression, a plaintiff must prove (1) that the defendant had a duty to disclose a material fact, (2) that the defendant suppressed this material fact, (3) that this suppression induced the plaintiff to act or refrain from acting, and (4) that the plaintiff suffered actual damage as a proximate result.  *State Farm Fire & Cas. Co. v.*

*Owen*, 729 So. 2d 834, 837 (Ala. 1998).  The duty to disclose requires a relationship between the parties, and whether or not a relationship exists is analyzed on a case-by-case basis.  *See Gen. Motors Corp. v. Bell*, 714 So. 2d 268, 280–81 (Ala. 1996) (an obligation to disclose may be imposed under the particular circumstances of a case).  The Twilleys argue that the commercial setting of communications between Cahaba and the Twilleys gave rise to a duty to disclose similar to the duty in a confidential relationship.  The Twilleys also contend that "[w]here one person has superior knowledge of a fact and suppression of that fact will induce another person to take action that he or she otherwise would not take, the obligation to disclose is particularly compelling."  *Life Ins. Co. of Ga. v. Parker*, 706 So. 2d 1108, 1112 (Ala. 1997).  Cahaba contends that it did not have a confidential relationship with the Twilleys or anything akin to one, and that the circumstances of this case do not give rise to special circumstances that would give Cahaba a duty to disclose.  *See State Farm*, 729 So. 2d at 842–43 (citing relative knowledge of the parties, value of omitted fact, plaintiff's opportunity to obtain the fact, customs of practice, and inequality in condition of the parties as factors to consider).

The Twilleys concede that there was no duty to disclose Bowater's rejection before April 2010, when Cahaba learned of the rejection.  But there is no evidence of a relationship giving rise to a duty to disclose even after Cahaba learned of the rejection.  "[T]he landlord-tenant relationship is not one of a fiduciary nature."  *DeWitt v. Long*, 519 So. 2d 1363, 1365 (Ala. Civ. App. 1987); *see Trio Broadcasters, Inc. v. Ward*, 495 So. 2d 621, 623 (Ala. 1986) ("[W]hen the parties to a transaction deal at arm's length . . . no obligation to disclose arises when, as in this case, information is not requested.").  In addition, no special circumstances appear in this case that would cause the court to impose a duty on Cahaba.  Neither the Twilleys nor Cahaba were

26

listed as creditors or debtors in regard to the lease and sublease in the Bowater bankruptcy.

Cahaba had an entirely separate executory fiber supply agreement with Bowater listed, and when

its counsel was notified of the deemed rejection of it, their investigation disclosed that the

Master Lease and Sublease, which had not been listed, had also been deemed rejected.  Some of

the Twilleys had heard of the existence of Bowater's bankruptcy proceedings, but there is no

evidence before the court that they investigated the proceedings to determine whether their lease

would be affected, and it seems to be conceded that they did not.  Although Cahaba knew of

Bowater's deemed rejection of the Master Lease and Sublease before the Twilleys did, that

superior knowledge alone is not sufficient to justify imposing an obligation of disclosure on

Cahaba.  *See State Farm*, 729 So. 2d at 843 (holding that superior knowledge of a fact is not

dispositive because one party usually has greater knowledge than the other).

   In addition to there being no evidence before the court that would have created a duty to

disclose, there is no evidence that failure to disclose induced all, or any, of the Twilleys to act or

refrain from acting in a way that proximately resulted in actual damage.  The Twilleys have not

attempted to show this separately as to each of them.  They have not shown that knowledge of

this would have caused all 17 to take affirmative steps to terminate the Master Lease and take

actual physical possession of the property to the exclusion of Cahaba, and when they obtained

such knowledge two opposed doing so.

   There was no duty on the part of Cahaba to disclose the fact that Bowater had rejected

the Master Lease, and the Twilleys have not shown that Cahaba made any fraudulent

misrepresentations or suppressed material facts, or that there was reasonable reliance by the

Twilleys which caused them to act, or refrain from acting, to their damage.  Summary judgment

in favor of Cahaba and Hancock is due as to both claims.

e.  <u>Unjust Enrichment, Accounting and Constructive Trust</u>

The Twilleys' claims for the equitable remedies of unjust enrichment, and accounting and

constructive trust, do not survive summary judgment.  For a plaintiff to prevail on an unjust

enrichment claim, it must show that "the defendant holds money which, in equity and good

conscience, belongs to the plaintiff or holds money which was improperly paid to defendant

because of mistake or fraud."  *Mantiply v. Mantiply*, 951 So. 2d 638, 654 (Ala. 2006) (internal

citations and emphasis omitted).  "In the absence of mistake or misreliance by the donor or

wrongful conduct by the recipient, the recipient may have been enriched, but he is not to have

been unjustly enriched." *Id.* at 655 (internal citations and emphasis omitted).  The Twilleys argue

that Cahaba was unjustly enriched by continuing to lease hunting rights and sell timber from the

Twilley property after the breach and rejection of the Master Lease.  However, because the

Master Lease has not been terminated, Cahaba rightly maintains possession of the Twilley

property, along with all rights granted to it under the Sublease.  Cahaba has kept its lease

payments and *ad valorem* taxes on the property up to date, and no evidence shows that Cahaba's

continuing to act as it always has under the leases is wrongful.

The Twilleys' request for an accounting and constructive trust employs a similar

argument—they allege in their counterclaim and third-party claim that any benefit gained by

Cahaba from the property after Bowater's rejection of the Master Lease rightfully belongs to the

Twilleys.  The Twilleys do not address this claim in their opposition to Cahaba's summary

judgment motion. *See Road Sprinkler*, 10 F.3d at 1568 (plaintiff had abandoned its claim when

28

it did not raise the issue after its complaint). Even if it was not abandoned by the Twilleys, Cahaba would be due summary judgment on this claim. A constructive trust exists "when property has been either acquired by fraud, or where in the absence of fraud it would not be equitable to allow it to be retained by him who holds it." *Brothers v. Fuller*, 607 So. 2d 135, 137 (Ala. 1992) (internal citation omitted). As discussed above, there was no fraudulent conduct on the part of Cahaba shown, and there is no equitable reason for Cahaba to give up its possession of the property and its benefits while the Master Lease and Sublease still stand.

### f. Abuse of Process

The Twilleys' abuse of process claim alleges that Cahaba used its declaratory judgment suit to pressure the Twilleys to execute the Estoppel and Agreement and to punish the members of the Twilley family who had not yet signed it. *See Warwick Dev. Co. v. GV Corp.*, 469 So. 2d 1270, 1274–75 (Ala. 1985) (abuse of process claim survived summary judgment where evidence showed suit was initiated as retribution). To maintain this claim, the Twilleys must show "(1) the existence of an ulterior purpose, (2) a wrongful use of process, and (3) malice." *C.C. & J., Inc. v. Hagood*, 711 So. 2d 947, 950 (Ala. 1998). Cahaba argues that the object of the declaratory judgment action was to resolve any dispute between the parties regarding the state of the Master Lease and Sublease after it became clear that some of the Twilleys believed the leases were no longer valid. "[O]ne of the purposes of the Declaratory Judgment Act is to render practical help in ending a controversy that has yet to reach the stage where legal relief is immediately available . . . ." *Harper v. Brown, Stagner, Richardson, Inc.*, 873 So. 2d 220, 224 (Ala. 2003) (emphasis omitted). That purpose applies in this action—whether the leases were terminated due to deemed rejection in bankruptcy, or by any subsequent actions, was the

29

operative question about which an actual controversy existed between the parties.  An annual lease payment was coming due and 15 of the 17 Twilley family members were insisting that the Sublease was terminated and that Cahaba had no right to continued possession.  Cahaba did not abuse the legal process by filing this action. Cahaba is due summary judgment on this claim.

g. Civil Conspiracy

The Twilleys' final claim alleges a civil conspiracy between Cahaba and Hancock.  "A civil conspiracy is a combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means." *Barber v. Stephenson*, 69 So. 2d 251, 254 (Ala. 1953).  The Twilleys' basis for this claim is that Cahaba and Hancock conspired to conceal Bowater's rejection of the leases and misrepresent that Cahaba was the lessor under the Master Lease.  *See Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297, 306 (Ala. 1986) (conspiracy existed when a corporation and other persons combined to deceive another).  This court has already determined in its prior Order that Bowater's rejection did not terminate the leases, and although the Twilley family's right to immediate possession arose at the time of rejection, they have not exercised that right by terminating the Master Lease. The evidence does not show that any action in concert between Cahaba and Hancock or any scheming to maintain their rights under the Sublease was unlawful or used unlawful means. Therefore, Cahaba is due summary judgment on the civil conspiracy claim.


Thus, all of these claims for injury to property, as well as the claims for injury to possession of the common property, fail to present genuine issues of material fact for resolution by a jury, and Cahaba and Hancock are entitled to judgment as a matter of law.

# V.  <u>CONCLUSION</u>

For the foregoing reasons, it is hereby ORDERED as follows:

1.  Cahaba's and Hancock's Second Motion for Summary Judgment is GRANTED as to Cahaba's Complaint for Declaratory Judgment, and it is hereby DECLARED that:

      a.  The Sublease of Cahaba Forests, Inc. is valid, enforceable, and in full force and effect, and Cahaba is bound by all obligations thereunder and under the Master Lease, and the Twilley family Defendants are entitled to receive the lease payments specified therein until and unless the Master Lease and the Sublease expire by their terms or are lawfully terminated by all 17 Twilley Defendants or all those who may succeed them in interest.

      b.  The leasehold and timber rights in the land described in the Sublease are vested in Cahaba Forests, Inc. alone, and the Defendants have no estate, right, title or interest in the leasehold and timber rights unless and until the Master Lease and Sublease are lawfully terminated or expire by their terms.

2.  The Twilleys' Motion for Partial Summary Judgment is DENIED.

3.  Cahaba's and Hancock's Second Motion for Summary Judgment is GRANTED as to all Counter-Claims and Third-Party Claims of the Twilleys, and those claims are DISMISSED with prejudice.

4.  A separate judgment will be entered in favor of Cahaba and Hancock and against the Defendants.

5.  Costs are taxed against all Defendants <u>except</u> Hay and Scott.

Done this 28th day of February, 2013.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE